# Third District Court of Appeal

## State of Florida

Opinion filed December 10, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D10-3090
Lower Tribunal Nos. 07-1168, 08-12927

_____

**Akbar Nikooie,**
Appellant/Cross-Appellee.

vs.

**JPMorgan Chase Bank, N.A., General Mortgage Associates, Inc.,
and Attorneys' Title Insurance Fund, Inc.,**
Appellees/Cross-Appellants.


An Appeal from the Circuit Court for Miami-Dade County, Gill S. Freeman, Judge.

Erik W. Scharf and Wayne R. Atkins (Coconut Creek); Assouline & Berlowe, P.A., and Peter E. Berlowe and Meredith J. Gussin, for appellant/cross-appellee.

Garbett, Stiphany, Allen & Roza, P.A., and David S. Garbett, for appellee/cross-appellant, JPMorgan Chase Bank, N.A.; Lerman & Whitebook, P.A. (Hollywood), and Carlos D. Lerman, for appellee/cross-appellant, JPMorgan Chase Bank, N.A.; Cohen Fox, and Mario M. Ruiz and Cynthia Morales for appellee/cross-appellant, Attorneys' Title Insurance Fund, Inc.


Before SHEPHERD, C.J., and SUAREZ and SALTER, JJ.

SALTER, J.

In this appeal and cross-appeal, we review a final judgment addressing competing claims among a group of real estate lenders. Despite the relative simplicity of Florida's recording laws and the well-settled procedures for mortgage loan closings, the underlying development project became a tangled knot of claims and counterclaims.[1] Embarrassingly for the legal profession, most of the tangled web is attributable to the acts and omissions of lawyers—though not those representing the parties here or in the trial court.[2]

We affirm the trial court's rulings in all respects but two. We reverse the trial court's determination that the lien of the appellant and cross-appellee, Akbar Nikooie, is a second-priority lien for $1,349,000 plus interest; and we remand so that it may be allowed as a first-priority lien for the principal amount of $116,000

---

[1] The trial judge summarized the case aptly in her final judgment:

> This matter presents factual permutations and issues that only a law professor could dream up. Trial counsel for all parties did yeomen's jobs in attempting to create silk purses from sow's ears for the benefit of their clients. However all were saddled with the underlying facts which were not of their making. There are no good answers to what occurred here. All of the parties and their transactional lawyers were caught up in the feeding frenzy engendered by the "hot" real estate market that came to a screeching "crash." All participants are responsible for the ensuing mess and their respective losses.

[2] The Florida Bar has suspended the license of at least two of the transactional attorneys responsible for the mess described by the trial judge. The various lenders' claims against the transactional attorneys were severed from the secured lenders' claims against the Property.

2

plus interest and as a third-priority lien for principal of $1,044,000 plus interest. We also reverse the trial court's determination that JPMorgan Chase Bank, N.A., as successor to Washington Mutual Bank, should be allowed a fourth-position equitable or mortgage lien for approximately $600,000 of a new loan purportedly made to a non-party in 2006. On remand, the trial court should afford Nikooie and JPMorgan an opportunity to demonstrate that they have paid documentary stamp and intangible taxes as required by Florida law if those parties seek enforcement of the additional principal amounts claimed by them below.

#### Nikooie, Zabaleta, Jacobazzi, and the Property

The appellant and cross-appellee is Akbar Nikooie, an investor. The prime piece of Miami Beach real estate at the center of the case, located at 4424 North Bay Road (the Property), was bought by Jason Zabaleta in January 2005. Zabaleta obtained a purchase money first mortgage for $3,150,000 from the non-party seller, North Bay Realty, LLC. Nikooie initially loaned Zabaleta $800,000 for renovations, evidenced by an unrecorded note and mortgage for $860,000 ($60,000 was included as the anticipated interest to accrue during the term of the loan). The mortgage was not recorded, Nikooie testified, in order to save recording expenses.[3]

During October 2005, Zabaleta and Daniel Jacobazzi transferred title to the Property in transactions more akin to rugby than bona fide property sales. First,

---

[3] Documentary stamp taxes due on recordation would have been $3,010; intangible tax would have been $1,720.

3

Zabaleta sold the Property to Jacobazzi, ostensibly for $5,600,000, and Jacobazzi obtained a purchase money mortgage on the Property from Washington Mutual Bank[4] for $3,902,500. Washington Mutual's mortgage was recorded and the requisite documentary stamp and intangible taxes were paid. The proceeds of that loan were used in part to satisfy North Bay Realty's purchase money mortgage ($3,165,534.20). That satisfaction was recorded in November 2005, so that Washington Mutual's mortgage was then the first-priority (and only) mortgage on the Property.

Zabaleta's deed to Jacobazzi was dated October 18, 2005, and it was recorded shortly after the Washington Mutual loan closing. On October 20, 2005, however, Jacobazzi reconveyed the Property to Zabaleta; that deed was not recorded until February 2006. In January 2006, Zabaleta borrowed a further $300,000 from Nikooie, in anticipation that Zabaleta would conclude the renovations and sell the Property at a profit. Zabaleta executed a mortgage and security agreement to secure the then-total amount owed by him to Nikooie, $1,160,000, acknowledging that it was second in priority to the purchase money first mortgage (the Washington Mutual mortgage). The Zabaleta-Nikooie mortgage for $1,160,000 was not recorded.

The Altered Mortgage

[4] Washington Mutual Bank later failed, and its assets were acquired by appellee JPMorgan Chase Bank, N.A.

4

In February 2006, someone altered the Zabaleta-Nikooie mortgage and note to reduce the stated $1,160,000 in secured indebtedness to $116,000. As so altered, the mortgage was recorded and documentary stamp tax ($406) and intangible tax ($232) on $116,000 were paid to the recorder's office and duly printed on the first page of the recorded twenty-three-page mortgage and secured promissory note. Page one of the mortgage and the promissory note (recorded as page twenty-three of the instrument) both reported the secured indebtedness as $116,000. Section 1.08 of the mortgage, page eight, provided:

> Equity Participation. The Mortgagee [Nikooie] originally lent the Mortgagor [Zabaleta] the principal sum of Eight Hundred Sixty Thousand and 00/100 Dollars ($860,000.00), which sum would have become due and payable as of February 1, 2006. The Mortgagor has lent the Mortgagee the additional principal sum of Three Hundred Thousand and 00/100 Dollars ($300,000.00). In lieu of interest, Mortgagee has agreed to accept a participatory interest in the profit from the sale of the Mortgaged Property, as more fully set forth in the Note.

Section 3.17 of the mortgage, page twenty, provided:

> Future Advances. This Mortgage is granted to secure future advances from the Mortgagee to the Mortgagor made, at the option of the Mortgagee, within twenty (20) years of the date hereof. The unpaid principal balance of the indebtedness hereby secured, exclusive of disbursements made by the Mortgagee for taxes, levies, assessments and insurance and exclusive of accrued interest, shall never at one time exceed the sum of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00).

Nikooie has asserted below and here that these provisions, coupled with a "mortgage modification agreement" signed by Zabaleta and recorded in June 2007,

5

confirm the first-priority lien status of his $1,160,000 loan (plus a later advance) relating back to the date of the altered mortgage (February 2006).

The Second Washington Mutual Loan

In June 2006 (when the 2005 Washington Mutual purchase money mortgage loan was in first-recorded position, and Nikooie's altered mortgage for $116,000 was in second-recorded position), Zabaleta sold the Property to Jose Mejia, a Venezuelan senator and military officer. Mejia's purchase was to be funded by a $4,500,000 purchase money mortgage from Washington Mutual. The proceeds of that loan were to be used to pay off the 2005 Zabaleta-Washington Mutual mortgage on the Property.

As matters would have it, however, the disbarred attorney serving as paralegal for the subsequently-suspended attorney acting as closing agent for the Zabaleta-Mejia transaction did not record the deed from Zabaleta to Mejia or the 2006 Washington Mutual mortgage, nor were any additional documentary stamp or intangible taxes then paid, so far as the record discloses, on the new or additional principal evidenced by the unrecorded mortgage and promissory note. The 2005 Washington Mutual mortgage was paid off ($4,226,554) and a satisfaction of the mortgage was recorded. Mejia did not pay the balance of the purchase price, just over $1,700,000. The altered (but recorded) $116,000 Nikooie mortgage was listed for payoff as part of the June 2006 transaction, but no

6

payment was made at that time, and no satisfaction was recorded. Nikooie's recorded mortgage had a due-on-sale provision, section 3.08, that Washington Mutual's closing agent ignored. The principal amount of the new Washington Mutual loan was sufficient to pay off the 2005 Washington Mutual loan and to pay off the Nikooie mortgage as recorded, but Washington Mutual (through its closing agent) did not pay Nikooie.

City First, GMAI, and Foreclosure

Two additional lenders then joined the stew. In October 2006, Zabaleta (still the record owner) arranged a further $2,500,000 mortgage loan from City First Mortgage Corp. City First understood that it was obtaining a first-priority mortgage loan, because (a) no deed from Zabaleta to Mejia had been recorded, (b) the 2005 Washington Mutual loan had been satisfied of record, and (c) the 2006 Washington Mutual mortgage signed by Mejia as the purchaser was not recorded. The closing agent for the City First loan obtained a payoff letter for the altered (but recorded) $116,000 Zabaleta-Nikooie mortgage from a subsequently-suspended attorney representing both Nikooie and Zabaleta. The letter specified that the payoff amount through the end of the month was $116,000. The closing agent wired the $116,000, but the lawyer for Nikooie and Zabaleta only paid $105,238.24 of that amount to Nikooie. The closing agent did not obtain or record a satisfaction of the altered mortgage in exchange for the wire transfer.

7

In January 2007, Zabaleta borrowed $3,500,000 from General Mortgage Associates, Inc. (GMAI), signing a note and mortgage for that amount. The proceeds paid off the City First mortgage on the Property, and GMAI intended to obtain a first-priority mortgage. A few days after the Zabaleta-GMAI loan closing, however, and before the recordation of the mortgage, Washington Mutual filed a lis pendens and commenced a foreclosure action on its July 2006 (unrecorded) mortgage loan. The foreclosure action initially did not join GMAI as a defendant. GMAI was later added as a defendant in Washington Mutual's amended complaint.[5] Ultimately, GMAI's title insurer (Attorneys' Title Insurance Fund, Inc., or ATIF) was substituted for GMAI.

Nikooie's Mortgage Modification Agreement

As pleadings in the Washington Mutual lawsuit began to fly, Nikooie apparently discovered that his only mortgage of record had been altered before recordation. In a mortgage modification agreement recorded June 1, 2007, Zabaleta recited that the January 2006 mortgage given to Nikooie was in fact a mortgage for $1,160,000, that a further $150,000 advance had been made under that mortgage, and that the amount owed by Zabaleta to Nikooie as of February 1, 2007, was actually $1,349,300, with interest accruing at thirteen percent per annum

---

[5] Nikooie argues that GMAI's motion to intervene was denied and that its motion to intervene was untimely under the lis pendens statute, section 48.23(1)(b), Florida Statutes (2007). As detailed in the analysis which follows, that argument is unavailing on this record.

thereafter. Zabaleta further promised to pay Nikooie $300,000 by May 15, 2007, and all remaining principal and interest by June 26, 2007. No such payments were made. The 2007 recorded mortgage modification did not evidence the payment of documentary stamp tax or intangible tax on the alleged indebtedness, beyond the payment of those taxes on the $116,000 altered (but recorded) Nikooie mortgage. In April 2009 (shortly before trial), Nikooie re-recorded the altered 2006 mortgage to pay additional taxes sufficient to reflect a total secured principal balance of $1,160,000.[6]

The rights and priorities of the three competing lenders regarding their claims, counterclaims, and cross-claims—Nikooie, JPMorgan as successor to Washington Mutual, and ATIF as successor to GMAI—were severed for non-jury trial. Following two days of trial in 2010, the trial court entered twenty-eight pages of well-organized and detailed findings untangling three years of convoluted, dodgy transactions. The lenders filed motions for rehearing or to amend that judgment, and those motions were granted in part and denied in part. Ultimately the trial court held:

---

[6] The 2006 Zabaleta-Nikooie mortgage re-recorded in 2009 nonetheless attached the altered promissory note ($116,000 versus $1,160,000). Further, the record does not reflect the payment of documentary stamp or intangible taxes on $189,300 purportedly advanced by Nikooie and included in the 2007 modification for a total of $1,349,300 in secured principal.

1. JPMorgan reestablished the unrecorded note and mortgage for $4,500,000 in principal signed by Jose Mejia in 2006. Of the total defaulted indebtedness ($6,537,054.92), however, only $6,097,575.98[7] of that amount is secured by a first-position lien on the Property. The trial court concluded that Washington Mutual's 2005 first-priority recorded mortgage loan was paid off and satisfied with the proceeds of the unrecorded 2006 mortgage loan to Mejia, such that equitable subrogation protected that position (the payoff amount, plus interest, represents the lien amount).

2. Nikooie's full $1,349,300 mortgage modification balance and interest, a total of $1,958,557.26, is the second-priority secured lien, according to the final judgment.

3. The balance of the Zabaleta indebtedness to JPMorgan (i.e., that portion of the 2006 Washington Mutual loan that was not disbursed to satisfy the 2005 Washington Mutual loan), $439,478.94, is the third-priority secured position.

4. The ATIF mortgage balance, $7,023,010.91, is the fourth-priority secured position.[8]

This appeal followed.

---

[7] All of these amounts were updated with additional accrued interest in the final judgment of foreclosure.

[8] ATIF stipulated that its lien would be junior to both portions of the JPMorgan secured indebtedness.

Analysis—Equitable Subrogation

In the main appeal, Nikooie argues that JPMorgan is not entitled to equitable subrogation because the doctrine only applies when "one person" is appropriately substituted "in the place of another," relying upon the analysis in Velazquez v. Serrano, 43 So. 3d 82, 83-84 (Fla. 3d DCA 2010), and the Restatement (Third) of Property: Mortgages section 7.6. In this case, Washington Mutual paid off Washington Mutual's prior loan on the Property. Nikooie maintains that "self subrogation" is not permitted under the doctrine, and that a lender cannot in effect "step into its own shoes."

There is no such general prohibition under Florida law. A party's entitlement to subrogation is dependent upon "the equities and attendant facts of each case." Velazquez, 43 So. 3d at 84 (quoting Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. KPMG Peat Marwick, 742 So. 2d 328, 332 (Fla. 3d DCA 1999)). Additionally, and as the Restatement (Third) of Property: Mortgages section 7.3 recognizes, a mortgage refinanced with a new loan by the same lender may be given the priority of the original mortgage under the principles of replacement and modification of mortgages. See Suntrust Bank v. Riverside Nat'l Bank of Fla., 792 So. 2d 1222, 1224 (Fla. 4th DCA 2001).

Nikooie is correct, however, that prejudice to a duly-recorded junior lienholder, as evaluated in Velazquez, precludes equitable subrogation in

11

derogation of that interest. In this case, as in <u>Velazquez</u>,[9] Nikooie's recorded mortgage for $116,000 included a due-on-sale provision and was senior to the second Washington Mutual mortgage. The Washington Mutual loan proceeds could have been, but were not, used to pay off both the existing Washington Mutual first mortgage and the Nikooie second mortgage as then recorded ($116,000 in principal).

<u>Analysis—Extent of Nikooie's Lien</u>

The extent of Nikooie's first mortgage lien is another matter, however, and is an issue in the cross-appeal. Nikooie maintains that his first lien should secure all $1,349,300 in principal pursuant to the altered mortgage and the 2007 modification. We disagree. The trial record establishes without dispute that Nikooie's mortgage at the time of Washington Mutual's refinance secured the principal balance of $116,000, plus interest, and that was reflected in the payoff documents. That portion of Nikooie's lien may not be subordinated to the JPMorgan/Washington Mutual payoff of the then-existing first mortgage. The balance of Nikooie's lien was not documented in the public records until 2007, and is therefore junior to the JPMorgan payoff plus interest.

---

[9] As this Court held in <u>Velazquez</u>, Ms. Velazquez "has been deprived of a legal right—the payment of her mortgage upon the sale of the property pursuant to the due-on-sale clause." 43 So. 3d at 84.

Additionally, there is no evidence in the existing record to demonstrate that Nikooie paid documentary stamp and intangible taxes on the last $189,300 of the claimed indebtedness. Section 201.08(1)(b), Florida Statutes (2007), specifies that a mortgage or other instrument "shall not be enforceable in any court of this state as to any such advance unless and until the tax due thereon upon each advance that may have been made thereunder has been paid." This is a statutory limitation on enforceability applicable to a mortgage lender in a Florida court whether or not the parties raise it (here, they did not). No payment of tax, no enforcement; thus, on the present record, Nikooie is only entitled to enforce mortgage liens totaling $1,160,000 plus interest.[10]

To be fair, the district courts of appeal have reached different conclusions regarding a lender's attempt to enforce a mortgage debt when the documentary stamp tax has not been paid. In this district, a note or mortgage may not be enforced until the tax has been paid,[11] but the court may permit the lender to pay the taxes belatedly. Klein v. Royale Grp., Ltd., 578 So. 2d 394, 395 (Fla. 3d DCA

---

[10]  Nikooie himself sought to save money and did not record the first $860,000 mortgage, and the negligence or malfeasance of his now-suspended transactional lawyer also does not cure the problem. Nikooie is pursuing the obvious remedies against the former attorney.

[11]  Solis v. Lacayo, 86 So. 3d 1147, 1148 n.1 (Fla. 3d DCA 2012) ("In an action to enforce a promissory note, when the trial court discovers that the documentary taxes have not been paid, the trial court must either dismiss the action without prejudice, or, upon motion, may abate the action to enable the party to purchase and affix the documentary stamps.").

13

1991).  The First District reached the same conclusion in <u>Silber v. Cn'R Industries of Jacksonville, Inc.</u>, 526 So. 2d 974 (Fla. 1st DCA 1988).

The Fifth District has addressed the particular question presented in the instant case, holding that "any court," including an appellate court, should refuse enforcement of a promissory note under section 201.08(1) if there is no evidence that the required documentary stamp taxes have been paid:

> To this end, section 201.08(1) constitutes an injunction prohibiting courts from enforcing rights created by instruments upon which required taxes have not been paid. . . .
> . . . .
> Unlike an affirmative defense, section 201.08 was not enacted for the protection of any particular class of defendants, nor was it enacted to preserve the integrity of the judicial proceedings. Therefore, a defendant's failure to plead a plaintiff's noncompliance with section 201.08 does not waive the state's right to receive payment of the requisite taxes nor does such noncompliance excuse the court from complying with the prohibition contained in the statute.

<u>Somma v. Metra Elecs. Corp.</u>, 727 So. 2d 302, 304 (Fla. 5th DCA 1999).  We agree.

The failure to pay intangible tax on the increased principal amount also precludes enforcement.  § 199.282(4), Fla. Stat. (2006).  That provision plainly pertains to mortgage liens for original loans and future advances alike.

The dissent raises two concerns regarding our analysis regarding unenforceability for non-payment of documentary and intangible taxes.  First, the dissent favors the interpretation by the Fourth District in <u>Glenn Wright Homes</u>

(Delray) LLC v. Lowy, 18 So. 3d 693 (Fla. 4th DCA 2009) (concluding that section 201.08(1) precludes enforcement as to "future advances," but not as to an original mortgage lien). We disagree with that interpretation, because it did not address the distinction between "each advance" under a mortgage and "any such future advance" in the last two sentences of section 201.08(1).[12] Second, the dissent expresses a concern that we are establishing precedent that Florida's appellate courts are "duty-bound to examine all debt instruments, mortgages, and other similar obligations in the quiet of our chambers for compliance with this state's complicated and ever-changing excise and tangible income tax laws and regulations." We respectfully disagree that any such affirmative duty exists or has been imposed by this opinion. Instead, we have addressed in this case the narrow question of whether this court should direct the trial court to enforce a note and mortgage lien, as urged by a party before us, when we have become aware from the instruments in the record and the relief sought by the parties that the required taxes have not been paid. We conclude that we should not ignore the non-payment

---

[12] "Each advance" includes both the initial disbursement of a mortgage loan and any subsequent advances, while "future advance" refers to subsequent disbursements described in section 697.04, Florida Statutes. The unenforceability provision—precluding enforcement until the documentary stamp taxes are paid on "each advance" under the mortgage—applies to all sums secured by the mortgage lien, not just to "future advances." We do not see, and evidently the First and Fifth District Courts also have not seen, any reason or legislative intention to limit the unenforceability rule to future advances, while declining to apply it to the original mortgage loan. Our reiteration of unenforceability in Solis n.11 supra was issued three years after the Fourth District's analysis in Glenn Wright Homes.

15

when it comes to our attention. And because this case is remanded for further proceedings, Nikooie and JPMorgan will have an opportunity to pay the unpaid taxes and eliminate the unenforceability question raised by the dissent.

Finally, irrespective of the documentary stamp and intangible tax issues (and as a matter of law), the recordation of Nikooie's mortgage modification agreement after the lawsuit had begun, and a year after Washington Mutual paid off the recorded 2005 Washington Mutual loan, could not inflate Nikooie's $116,000 mortgage lien into one for $1,349,300 with a priority relating back to that of the altered instrument. A review of the "equity participation" provision, section 1.08 of the altered Nikooie mortgage,[13] does not state that prior loans for $860,000 and $300,000 are secured by the lien of the mortgage. That provision only states that Nikooie had agreed to accept "a participatory interest in the profit from the sale" of the Property, a covenant which might affect (in an unspecified manner) the division of profits between Nikooie and Zabaleta, but not one which would require repayment of $1,160,000 upon any payoff of the prior Washington Mutual mortgage or for satisfaction of the Nikooie mortgage. The altered Nikooie mortgage appears regular on its face, was duly recorded with taxes paid on $116,000 in debt, recites the amount of $116,000 as the amount of indebtedness on page one of the mortgage, and includes a promissory note signed by Zabaleta for

---

[13] The complete text of section 1.08 is set forth above.

16

$116,000. For these reasons, we reverse and remand the final judgment below for (a) modification to recognize the first priority of Nikooie's unsatisfied mortgage for $116,000 plus interest,[14] and (b) reduction of the balance of Nikooie's lien from $1,233,300 plus interest to $1,044,000 plus interest, for allowance as a third-priority lien.

Had Washington Mutual wired $116,000 to Nikooie's attorney to pay off the Nikooie mortgage in June 2006 (when the 2005 Washington Mutual mortgage was paid off), Nikooie would have no entitlement to a first mortgage lien. No such payoff letter and corresponding wire transfer arguably occurred, however, until the City First loan closed (four months later), with the result that Nikooie's claim of prejudice against Washington Mutual is valid, but only to the extent of the $116,000 mortgage of record in June 2006. The City First payment did not produce a satisfaction of Nikooie's altered mortgage because (the trial court found) the payments of approximately $105,000 to Nikooie from his attorney's trust account were said to be for repayment of yet another unsecured, unrecorded advance.

Analysis—Lis Pendens

---

[14] On remand, and following final calculation of each lien, the trial court should also calculate any attorney's fees and costs awardable with respect to that lien and lender.

Nikooie also argues in his direct appeal that ATIF's claims were barred by its predecessor's (GMAI's) "untimely intervention" under the lis pendens statute, section 48.23(1)(b), Florida Statutes (2007):

> Except for the interest of persons in possession or easements of use, the filing for record of such notice of lis pendens shall constitute a bar to the enforcement against the property described in said notice of lis pendens of all interests and liens including but not limited to federal tax liens and levies, unrecorded at the time of filing for record such notice of lis pendens unless the holder of any such unrecorded interest or lien shall intervene in such proceedings within 20 days after the filing and recording of said notice of lis pendens.

In this case, Washington Mutual's lis pendens was recorded on January 12, 2007. The GMAI mortgage was recorded on January 19, 2007. GMAI's motion to intervene was served February 9, 2007, and docketed February 13, 2007. The trial court correctly held, however, that Washington Mutual's amended complaint brought GMAI into the case as a party. The record does not disclose any objection by Nikooie to Washington Mutual's amendment or to the addition of GMAI as a party.[15] A motion and proposed response in intervention by GMAI directed to the original complaint were not required. GMAI's pending motion for intervention was appropriately denied as moot.

---

[15] To the contrary, Nikooie filed a motion to dismiss the amended Washington Mutual complaint without objecting to the addition of GMAI as a party. Asserting that his own lien claim had priority over any lien claim by Washington Mutual, Nikooie later filed his own foreclosure cross-claim and lis pendens. That lis pendens was recorded months after the recordation of GMAI's mortgage.

The twenty-day bar in the lis pendens statute, increased by the Legislature in 2009 to thirty days, exists for the benefit of the plaintiff and to warn non-parties. It does not preclude the plaintiff from amending its complaint, and thereby effectively amending its lis pendens. As a notice to the lawsuit itself—not to a particular and forever-limited universe of parties and claims—the lis pendens provided notice after amendment to the claims and cross-claims of GMAI. The plain words of the statute do not preclude a plaintiff's decision to add an otherwise-untimely lien claimant as a defendant in an amended pleading.[16]

In this analysis, we have carefully considered Adhin v. First Horizon Home Loans, 44 So. 3d 1245 (Fla. 5th DCA 2010). Adhin addressed the question of whether section 48.23(1)(b) is procedural or substantive in its effect. Id. (addressing this issue in the context of an argument that the statute is an unconstitutional incursion by the Legislature into the procedural right, pursuant to Florida Rule of Civil Procedure 1.230, to intervene "at any time" in a lawsuit). The Fifth District concluded that the bar is substantive in its effect and that section 48.23(1)(b) is therefore constitutional. Id. at 1254. It characterized the provision as a nonclaim statute that "automatically bars enforcement against the property by the holder of the unrecorded interest after the prescribed twenty-day period,

---

[16] And if GMAI's joinder had been found to be untimely (and its 2007 mortgage unenforceable), this would simply have allowed GMAI's successor, ATIF, to establish that GMAI's payoff of the City Mortgage recorded lien entitled it to City Mortgage's pre-lis pendens priority.

19

provided that the litigation proceeds to final judgment and judicial sale." Id. at 1253 (citing In re Brown's Estate, 117 So. 2d 478 (Fla. 1960); Matter of Estate of Kubby, 929 P.2d 55 (Colo. Ct. App. 1996)). Adhin did not decide whether that substantive right could be waived by the proponent of the lis pendens or by other lien claimants in a particular lawsuit.

The other distinguishing twists in the instant case are that the proponent of the lis pendens amended its complaint to permit an otherwise-barred lien claimant to defend its interests and prosecute its own cross-claim, and that Nikooie made no timely objection to that amendment. To the contrary, Nikooie filed his own lawsuit, later consolidated with the Washington Mutual action, to establish the alleged priority of his lien. Nikooie also recorded his own lis pendens (after the recordation date of the GMAI mortgage). On such a record, we agree with the trial court's conclusion that section 48.23(1)(b) did not bar GMAI's prosecution of its loan and lien claims against the Property.

Analysis—Washington Mutual's 2006 Unrecorded Mortgage

As noted, the trial court split the 2006 Washington Mutual mortgage loan to Mejia into two separate pieces with different priorities. Those proceeds used to pay off the recorded 2005 Washington Mutual mortgage were assigned a first-priority lien position against the Property by the trial court (though we have reversed and remanded to assign that amount a second-priority position), while the

20

surplus loan proceeds (those above the payoff amount) were assigned a third-priority lien position.  We reverse and remand the determination as to the surplus proceeds, however, because the record does not establish that either Washington Mutual or JPMorgan (or any other entity) has paid documentary stamp or intangible taxes on the additional sums advanced above the first mortgage payoff in 2006.  The amount used to satisfy the 2005 mortgage loan may be enforced because documentary stamp and intangible taxes were paid on that mortgage pursuant to Chapters 199 and 201; no such payments apparently were made by Washington Mutual regarding the additional principal.  The same bar of sections 199.282 and 201.08, Florida Statutes (2006), that applies to Nikooie applies as well to JPMorgan.  As a result, the JPMorgan third-position lien allowed by the trial court is not presently enforceable against the Property.

On remand, Nikooie and JPMorgan are to be afforded an opportunity to prove payment of the statutory documentary stamp and intangible taxes on their respective incremental claim amounts: (a) in the case of Nikooie, the $189,300 included in the 2007 mortgage modification agreement but as to which no stamp or intangible taxes appear to have been paid; and (b) in the case of JPMorgan, that portion of the 2006 Washington Mutual refinance that exceeded the principal balance of the 2005 original Washington Mutual first mortgage.  In the event that those taxes are proven to have been paid, the trial court may then enforce the

21

additional claims with the appropriate lien priority determined in accordance with this opinion.

Conclusion

For the avoidance of doubt, we find no error by the trial court with respect to those claims of the parties in the appeal and cross-appeals beyond the limited points addressed in this opinion. We reverse and remand for the entry of a final judgment recognizing the following liens and priorities (including, in each case, any allocable attorney's fees and costs to which a lender may have demonstrated entitlement):

1. Recognizing a first mortgage lien held by Nikooie in the principal amount of $116,000 plus interest.

2. Recognizing a second mortgage lien held by JPMorgan, as successor to Washington Mutual, but only to the extent of the amounts paid by Washington Mutual in 2006 to obtain a satisfaction of the 2005 mortgage loan to Jacobazzi, plus interest.

3. Recognizing a third mortgage lien held by Nikooie, to the extent of $1,044,000 in principal, plus interest, as to which Nikooie paid the required documentary stamp and intangible taxes when he re-recorded the previously-altered mortgage in 2009.

4. Recognizing a fourth mortgage lien held by ATIF, as successor to GMAI, in the balance of its 2007 loan plus interest and attorney's fees and costs.

Recognizing that the final judgment under review was limited to the severed claims and priorities of the three lenders vis-à-vis the Property, we caution that nothing in this opinion is intended to discharge any personal (unsecured) liability of Zabaleta or Mejia, or any liability of the transactional attorneys and their firms. We are remanding the case with instructions to permit Nikooie and JPMorgan an opportunity to provide confirmatory record evidence that the statutory taxes have been paid (also permitting them to "cure" the documentary stamp and intangible tax deficiencies by paying the applicable amounts after the fact) in order to regain a higher, enforceable recovery from any foreclosure proceeds. Should Nikooie do so, the amount of Nikooie's allowed third lien would increase from $1,044,000 in principal, plus interest, to $1,233,300 in principal, plus interest. Should JPMorgan do so, it would have an enforceable fourth lien for the differential between its refinance amount and the amount of the new mortgage closed (but not recorded) in 2006, plus interest, and this would push ATIF's lien to fifth priority.

Affirmed in part, reversed in part, and remanded with directions.

SUAREZ, J. concur

23

SHEPHERD, C.J., dissenting in part.

The news of this court's sua sponte decision, issued today, to exempt the real property from the natural consequences of nearly half-a-million dollars of defaulted mortgage debt in this case because of non-payment of excise and intangible taxes will, I think, come as quite a surprise to the readers of the majority opinion. The question of whether taxes were paid neither was raised below nor on appeal. More importantly, the majority's sua sponte decision to examine the notes

and mortgages for payment of taxes admits to no limiting principle. Under its mandate, we have become duty-bound to examine all debt instruments, mortgages, and other similar obligations in the quiet of our chambers for compliance with this state's complicated and ever-changing excise and tangible income tax laws and regulations.[17] I do not believe this is the law and, for this reason, most respectfully dissent.

The crux of the majority opinion, from which all else flows, is its belief that a mortgage debt is unenforceable in Florida unless excise[18] and intangible taxes[19] have been paid on the mortgage, regardless of whether nonpayment is raised as a bar to enforcement. As authority for the former, the majority plucks a phrase from the last sentence of section 201.08(1)(b) of the Florida Statutes, which states that a mortgage, trust deed, or other instrument "shall not be enforceable in any court of this state as to any **such** advance unless and until the tax due thereon upon each advance that may have been made thereunder has been paid." Majority Op. p. 12 (emphasis added). As the bolded word suggests, and analysis reveals, the phrase does not support such an expansive reading of the statute.

_____

[17] The majority "disagree[s] that any such affirmative duty exists or has been imposed by this opinion," Slip. Op. at 16, but that is precisely what the majority has done. If not, I ask, respectfully, why are we here?

[18] Excise taxes, also known as documentary stamp taxes, are governed by Chapter 201 of the Florida Statutes, titled "Excise Tax on Documents."

[19] Intangible taxes are governed by Chapter 199 of the Florida Statutes, titled "Intangible Personal Property Taxes."

The clause lifted by the majority from section 201.08(b)(1) is taken from the last sentence of section 201.08(b)(1).  Section 201.08 reads in full as follows:

**201.08. Tax on promissory or nonnegotiable notes, written obligations to pay money, or assignments of wages or other compensation; exception**

(1)(a) On promissory notes, nonnegotiable notes, written obligations to pay money, or assignments of salaries, wages, or other compensation made, executed, delivered, sold, transferred, or assigned in the state, and for each renewal of the same, the tax shall be 35 cents on each $100 or fraction thereof of the indebtedness or obligation evidenced thereby. The tax on any document described in this paragraph may not exceed $2,450.

(b) On mortgages, trust deeds, security agreements, or other evidences of indebtedness filed or recorded in this state, and for each renewal of the same, the tax shall be 35 cents on each $100 or fraction thereof of the indebtedness or obligation evidenced thereby. Mortgages, including, but not limited to, mortgages executed without the state and recorded in the state, which incorporate the certificate of indebtedness, not otherwise shown in separate instruments, are subject to the same tax at the same rate. When there is both a mortgage, trust deed, or security agreement and a note, certificate of indebtedness, or obligation, the tax shall be paid on the mortgage, trust deed, or security agreement at the time of recordation. A notation shall be made on the note, certificate of indebtedness, or obligation that the tax has been paid on the mortgage, trust deed, or security agreement. If a mortgage, trust deed, security agreement, or other evidence of indebtedness is subsequently filed or recorded in this state to evidence an indebtedness or obligation upon which tax was paid under paragraph (a) or subsection (2), tax shall be paid on the mortgage, trust deed, security agreement, or other evidence of indebtedness on the amount of the indebtedness or obligation evidenced which exceeds the aggregate amount upon which tax was previously paid under this paragraph and under paragraph (a) or subsection (2). If the mortgage, trust deed, security agreement, or other evidence of indebtedness subject to the tax levied by this section secures future advances, as provided in s. 697.04, the tax shall be paid at the time of recordation

26

on the initial debt or obligation secured, excluding future advances; at the time and so often as any future advance is made, the tax shall be paid on all sums then advanced regardless of where such advance is made. Notwithstanding the aforestated general rule, any increase in the amount of original indebtedness caused by interest accruing under an adjustable rate note or mortgage having an initial interest rate adjustment interval of not less than 6 months shall be taxable as a future advance only to the extent such increase is a computable sum certain when the document is executed. Failure to pay the tax shall not affect the lien for any such future advance given by s. 697.04, but any person who fails or refuses to pay such tax due by him or her is guilty of a misdemeanor of the first degree. **The mortgage, trust deed, or other instrument shall not be enforceable in any court of this state as to any such advance unless and until the tax due thereon upon each advance that may have been made thereunder has been paid**.

§ 201.08(1), Fla. Stat. (2005) (emphasis added). On plain reading, it is clear the sentence on which the majority relies for support is applicable only to future advances. The majority's interpretation of the statute, that "each advance" includes both the initial loan disbursement and any subsequent advances, is unsustainable. Reading the words in the context of the whole statute, as we are required to do, Acosta v. Richter, 671 So. 2d 149, 153-54 (Fla. 1996), "each advance cannot be interpreted to include the original loan disbursal because the statute distinguishes between "future advances" and the "initial debt or obligation." § 201.08(1) ("If the mortgage . . . subject to the tax levied by this section secures **future advances** . . . , the tax shall be paid at the time of the recordation of the **initial debt or obligation** secured, excluding future advances; at the time and so often as any future advances is made, the tax shall be paid on all sums then

27

advanced . . . .") Thus, the unenforceability provision applies to future advances, not the initial loan disbursal.

Judge Martha Warner cogently explained the workings of section 208.08(1) as follows:

> Section 201.08(1) provides for the tax to be paid on promissory notes and mortgages or other deeds of trust. It divides them into two categories: (a) unsecured notes for the payment of money, and (b) notes or instruments secured by an instrument filed in the public records.
>
> . . . .
>
> The first subsection makes no reference to a prohibition of enforcement of a promissory note prior to paying the tax on the note. The second subsection deals with notes involving recorded instruments where the taxes are paid at the time of recording. For mortgages permitting future advances, the amount of future advances is excluded in computing the tax due. **The last sentence prohibits enforceability of a mortgage or instrument where an advance has been made after recording of the original mortgage, and no tax has been paid on the amount of the advance.**
>
> The state has a substantial interest in ensuring collection of taxes owed. That is why it requires evidence of the payment of the tax prior to recordation of any taxable instrument. **The state has elected to enforce its taxes on unsecured promissory notes, however, through the use of its criminal laws and substantial penalties. See, e.g., § 201.17, Fla. Stat.**

Glenn Wright Homes v. Lowy, 18 So. 3d 693, 695-696 (Fla. 4th DCA 2009) (en banc) (emphasis added). The en banc panel of the Fourth District Court of Appeal then concludes:

28

> The string of cases applying a prohibition against enforcement of promissory notes appear to misread the statute. See Rappaport [v. Hollywood Beach Resort Condo. Ass'n], 905 So.2d 1024 [Fla. 4th DCA 2005]; Bonfiglio [v. Banker's Trust Co. of Cal.], 944 So.2d 1087 [Fla. 4th DCA 2006]; **Somma v. Metra Electronics Corp., 727 So.2d 302 (Fla. 5th DCA 1999); Klein v. Royale Group, Ltd., 578 So.2d 394 (Fla. 3d DCA 1991); Silber [v. Cn'R Indus. of Jacksonville, Inc.], 526 So.2d 974 [Fla. 1st DCA 1988].**

Id. at 696 (emphasis added). The bolded cases constitute the entirety of the authority relied upon by the majority for its "no payment of tax, no enforcement" position. See Majority. Op. p. 14. The reasoning of the authorities on which the majority relies is flawed.

Chapter 199 of the Florida Statutes, titled "Intangible Personal Property Taxes," is similarly structured. Chapter 199 imposes "a one-time non-recurring tax of 2 mills on the just valuation of all notes, bonds and other obligations for the payment of money which are secured by a mortgage, deed of trust or other real property situated in this state." § 199.133(1), Fla. Stat. (2005). The practical effect of this law, as it exists today, is to make the imposition of an intangible tax and a documentary tax on the participants to a mortgage transaction identical.[20] It is now simply one of two taxes, including the excise tax, which is "due and payable" to the Clerk of the Circuit Court at the time a mortgage on real property is tendered

---

[20] Until 2007, Chapter 199 also imposed an annual intangible tax levy on unsecured obligations for the payment of money, including unsecured promissory notes, stocks and bonds. This levy was repealed by the Florida Legislature in 2006. See Laws of Fla. Ch. 2006-312 (2006) (eff. Jan. 1, 2007). Thus, today, the tax is simply one of two taxes required to be paid on mortgage debt in this state.

for recording. § 199.135(1), Fla. Stat. (2005).[21]  As with the excise tax, an unpaid intangible tax is collectible only through the use of criminal laws and the substantial penalties imposed and collected by the Florida Department of Revenue. See § 199.282(1) (2005) Fla. Stat. (making willful failure to pay intangible tax a third-degree felony); § 199.282(2)-(3) Fla. Stat. (2005) (assessing penalties); §12C-2.007, Fla. Admin. Code (assessing penalties and interest).  Finally, analogous to the language of section 201.08(b) concerning future advances, section 199.282(4) states with respect to intangible taxes: "No mortgage, deed of trust, or other lien upon real property situated in this state shall be enforceable in any Florida court . . . until the nonrecurring tax imposed by this chapter . . . has been paid."  However, just like section 201.08(b), section 199.282(4) nowhere imposes an obligation on a judge of this or any other court to enforce collection of the tax.[22]

There is no doubt, as Judge Warner eloquently wrote in Glenn Wright Homes, the state has a substantial interest in ensuring the payment of taxes owed.

---

[21] The Clerk of the Circuit Court is a constitutional officer, who is neither an agent nor employee of the circuit court.  See Art. V, § 16, Fla. Const.

[22] Although custom and prudence have long dictated these taxes are paid in conjunction with the recording of the document, the Clerk of the Circuit Court, as well, has no obligation to collect the tax.  §§ 201.11, 199.135, Fla. Stat. (2005). The Clerk of the Circuit Court **must** record any mortgage instrument presented to him or her for recording upon payment of the clerk's per page service charge. §§ 28.222, 28.24, Fla. Stat. (2005); Op. Atty. Gen., 075-309, Dec. 22, 1975.  In collecting these taxes, the Clerk merely is the on-site agent to receive funds for the Florida Department of Revenue.  §§ 201.11(2), 199.135, Fla. Stat. (2005); Pignut v. Great W. Bank, 664 So. 2d 1011, 1014-15 (Fla. 4th DCA 1996).  The Florida Department of Revenue is the enforcing body.

The majority naturally shares that interest. However, as the statutory law and rules and regulations of the Florida Department of Revenue make clear, an unpaid excise or intangible tax on the principle amount of mortgage debt is collectible only through the use of the criminal laws, and substantial penalties imposed and collected by the Florida Department of Revenue. Id. at 695-696. In fact, to read Chapters 199 and 201 of the Florida Statutes to require the judges of this state to independently review mortgages and incorporated certificates of indebtedness for the payment of excise and intangible taxes before proceeding with actions filed before them raises serious separation of powers questions under our scheme of government. The collection of taxes is an executive branch function. Div. of Alcoholic Beverages & Tobacco v. McKesson Corp., 574 So. 2d 114, 117 (Fla. 1991) (Overton, J., concurring). Under this state's separation of powers doctrine, see Art. II, sec. 3, Fla. Const., the legislature cannot, short of a constitutional amendment, reallocate the balance of power among the branches of government. Chiles v. Children A, B, C, D, E, & F, 589 So. 2d 260, 264 (Fla. 1991).

Finally, in each of the cases cited by the majority to support its position that it must rise to a legislative command, the respective defendants themselves each raised the issue of unenforceability. See Solis v. Lacayo, 86 So. 3d 1147 (Fla. 3d DCA 2012) (acknowledging debtor moved "to vacate final judgment, arguing that the documentary stamps had not been paid"); Somma v. Metra Elecs. Corp., 727

31

So. 2d 302, 303 (Fla. 5th DCA 1999) (stating the defendant "moved for involuntary dismissal of the lawsuit, arguing that the trial court lacked authority to enforce the note because the taxes due on the note had not been paid"); Klein v. Royale Grp., Ltd., 578 So. 2d 394, 395 (Fla. 3d DCA 1991) ("[T]he defendant-guarantor moved for an involuntary dismissal because of the plaintiff's failure to pay the necessary tax on the promissory note and affix the appropriate documentary stamps to the written obligation as required by section 201.208, Florida Statutes (1989)."); Silber v. Cn'R Indus. of Jacksonville, Inc., 526 So. 2d 974, 975 (Fla. 1st DCA 1988) (noting defendants moved to dismiss the plaintiff's cause of action to enforce the note, contending the note was unenforceable for failure to comply with section 201.08). The majority cites no case where a trial judge sua sponte has exempted real property from the natural consequences of defaulted mortgage debt, nor have I been able to locate such a case. When the parties fail to raise an issue, I do not believe this court must search all records to find a basis upon which to reverse.

For all these reasons, and as section 201.08(1)(b) expressly requires, I would credit all principal amounts due each creditor on each mortgage and order the priorities of those liens chronologically by recording event as follows:

1. Akbar Nikooie in the principal amount of $116,000 plus interest, based upon the recording of the modified $116,000 mortgage on February 23, 2006.

2.    JPMorgan, as successor to Washington Mutual, in the full principal amount of $4,500,000 plus interest, based upon the filing of the lis pendens in its foreclosure action on January 12, 2007.

3. General Mortgage Associates, Inc. in the full principal amount of $3,500,000 plus interest, based upon the recording of its mortgage on January 19, 2007.

4. Akbar Nikooie in the principal amount of $1,194,000 plus interest, based upon the Mortgage and Modification Agreement given to Akbar Nikooie by Jason Zabaleta, recorded on June 1, 2007.

 Accordingly, I would affirm in part and reverse in part the judgment entered below.